

The following constitutes
the order of the court. Signed March 10, 2006

Marilyn Morgan
U.S. Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JASMINE NETWORKS, INC., | Case No.-02-54815-MM |
| Debtor. | Chapter 11 |
| OFFICIAL UNSECURED CREDITORS' COMMITTEE OF JASMINE NETWORKS, INC., | Adversary No. 04-5285 |
| Plaintiff, | |
| vs. | **MEMORANDUM DECISION ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| SREERANGA RAJAN, | |
| Defendant. | |

## INTRODUCTION

In this adversary proceeding, the Official Unsecured Creditor's Committee for Jasmine Networks, Inc. seeks to collect approximately $ 73,514.20 allegedly due on two notes executed by the defendant, Sreeranga Rajan, a former consultant to the debtor. After hearing the Committee's motion for summary judgment, the court took the matter under submission. Based on the evidence presented in the parties' papers, as well as the argument before the court, for the reasons set forth below, partial summary judgment is granted regarding the validity of the notes, the amounts due thereunder and Rajan's liability for the amounts due.

1

MEMORANDUM DECISION AND ORDER

# BACKGROUND

In February 2000, Jasmine and Rajan entered into a letter agreement under which Rajan would provide consulting and advisory services to Jasmine. Jasmine offered Rajan a fee of $3,000 per engineer screened, evaluated and recommended by Rajan and hired with his help. The letter also indicated that a recommendation would be made to Jasmine's board of directors to grant Rajan an option on 50,000 shares of Jasmine's stock subject to Jasmine's usual vesting schedule for options. A second recommendation would be made to award an option on an additional 25,000 shares after Jasmine recruited fifty engineers due to Rajan's efforts.

During the time Rajan was a consultant for Jasmine, the Jasmine Networks, Inc. 1999 Stock Incentive Plan (the "Plan") made all of Jasmine's employees, directors, independent contractors and consultants eligible to be considered for stock option grants. The purpose of the Plan was to attract, retain and motivate the recipients of the options. On June 13, 2000, Jasmine's Board of Directors acted pursuant to the recommendation in the letter agreement with Rajan and passed a motion to grant Rajan 50,000 nonstatutory stock options pursuant to Jasmine's Plan. Shortly thereafter, around June 26, 2000, Rajan received a package of documents along with a cover memorandum related to both the grant and the early exercise of his option to purchase Jasmine's stock. The cover memorandum instructed Rajan and his spouse to read all of the documents carefully. It listed the documents included in the package and, with respect to a number of the documents including the the Early Exercise Notice and Restricted Stock Purchase Agreement it stated that "[t]his must be signed by you and your spouse, if any." Rajan and his wife executed all of the documents.

One of the documents in the package was a Notice of Stock Option Grant ("Notice"). The Notice advised Rajan that he had been granted the right to purchase up to 50,000 shares of Jasmine's common stock for $0.286 cents per share for a total exercise price of $14,300. The Notice set forth a vesting schedule indicating that the option would not begin to vest until February 6, 2001, at which time it would vest with respect to twenty-five percent of the shares. Thereafter, additional shares would vest each month. The Notice also stated, however, that the option "may be exercised prior to becoming vested, in accordance with the Plan and the Stock Option Agreement" that were also in the package.

The Stock Option Agreement provided that Rajan could exercise the option at any time after its grant, but if Rajan were to choose to exercise the option as to unvested shares, then Rajan would have to execute the "Early Exercise Notice and Restricted Stock Purchase Agreement," which would allow Rajan to convert his option into 50,000 shares of common stock prior to the time that the option would otherwise have vested. The Early Exercise Agreement, in turn, provided that Rajan "elects to exercise [the] option to purchase . . . 50,000 Shares that have not yet vested under the Vesting Schedule" set forth in the Notice for a total purchase price of $14,300.

The Stock Option Agreement and the Early Exercise Agreement also described certain tax benefits that were available to Rajan if he exercised his option early. For example, the Stock Option Agreement explained that if Rajan exercised his option early, the one year holding period for more favorable long-term capital gain purposes would start to run upon exercise rather than on the vesting date. The Early Exercise Agreement further explained how early exercise with an election under § 83(b) of the Internal Revenue Code could prevent recognition of ordinary income if the stock price rose over time.

Rajan exercised his option early by executing the Early Exercise Agreement. He paid for the 50,000 shares by executing a promissory note for $14,300 plus 6.43% interest per annum. Although the note matured in June 2007, it provided that the full amount of the note would become immediately due and payable if Rajan's consulting relationship was terminated prior to full payment. The note also expressly provided that "This Note, which is full recourse, is secured by a pledge of certain shares of Common Stock of the Company." In the event that Rajan's consulting relationship was terminated, the Early Exercise Agreement also gave Jasmine the option to repurchase any and all unvested shares with a corresponding reduction in any amount Rajan owed to Jasmine equal to the price of the shares being repurchased.

On September 1, 2000, Jasmine's Board of Directors approved a second stock option grant in Rajan's favor. Shortly thereafter, Rajan received and executed a Notice of Stock Option Grant indicating that he had been granted the right to purchase up to 75,000 shares of Jasmine's common stock for $0.5466 cents per share for a total exercise price of $40,995. The October Notice contained language identical to the June Notice regarding the vesting schedule and the ability to exercise the

3

option prior to vesting. The October Stock Option Agreement was also identical to the June Stock Option Agreement. The October Early Exercise Agreement, that Rajan executed provided that Rajan "has elected to exercise [the] option to purchase . . . 75,000 Shares that have not yet vested under the Vesting Schedule" set forth in the Notice for a total purchase price of $40,995. In all other material respects, it was identical to the June Early Exercise Agreement.

As in June, Rajan exercised his option early by executing the October Early Exercise Agreement. Again, he purchased the 75,000 shares by executing a promissory note, dated October 18, 2000 in favor of Jasmine for $40,995 plus interest at a rate of 6.43% per annum. The October note was to mature in September 2007, but again provided that it would become immediately due and payable if Rajan's consulting relationship was terminated prior to payment in full. Like the June note, the October note provided that it was "full recourse," and was secured by a pledge of the stock being purchased. The October note also specifically provided that Jasmine did not waive any of its rights or remedies under the note unless the waiver was set forth in writing signed by the company.

Approximately two months after Rajan signed the second note, the consulting relationship between Jasmine and Rajan came to an end. Because Rajan never made any payments on either note, the full amount of both notes became immediately due and payable in December 2000.

On August 28, 2002, Jasmine filed for relief under chapter 11 of the Bankruptcy Code. About a year later, the court authorized the Committee to act on behalf of Jasmine's estate to investigate and collect the various promissory notes executed by former Jasmine employees and consultants. Despite the Committee's demands, Rajan has not made any payments of principal or interest on either the June or October note.

### LEGAL DISCUSSION

Under Rule 7056 of the Federal Rules of Bankruptcy Procedure, summary judgment is to be determined by the same standards used to decide summary judgment motions under Fed. R. Civ. P. 56. As a result, summary judgment is proper if the evidentiary proof offered by the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. When a plaintiff

4

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  moves for summary judgment, the plaintiff must demonstrate all the elements of the claim for relief to
2  prevail. *Lockwood v. Wolf Corp.,* 629 F.2d 603, 611 (9th Cir. 1980). Thus, to succeed on its breach of
3  contract claim against Rajan, the Committee must show 1) the existence of a contract, 2) Jasmine's
4  performance or excused nonperformance of the contract, 3) Rajan's breach of the contract, and 4)
5  damages to Jasmine as result of the breach. *Regan Roofing Co. v. Superior Court*, 24 Cal. App. 4th 425,
6  434-35 (1994). Here, the Committee met its initial burden of presenting admissible evidence supporting
7  each of these elements. Further, Rajan has not disputed that he executed the June and October
8  promissory notes in favor of Jasmine, that he did not pay either note when it became due in December
9  2000, and that the full amount of both notes, plus interest, remains unpaid. Notwithstanding the
10 Committee's prima facie showing, however, Rajan argues that the Committe's motion should be denied
11 based on several defenses. First, he asserts that the terms of the contract are ambiguous and create a
12 question of fact regarding its proper interpretation. Second, he urges that mutual mistake of fact
13 prevents enforcement of the contract on the terms urged by the Committee. Third, he asks the court to
14 find that there is a triable issue of fact as to whether certain misrepresentations induced him to sign the
15 contract at issue. Fourth, Rajan urges that he is entitled to a full setoff of any amounts due under the
16 contract because Jasmine never paid him for the consulting services he performed. Finally, Rajan
17 argues that the Committee's breach of contract claim is barred by laches. Each of these defenses will
18 be discussed separately below.

**I.    The Promissory Notes and Related Contractual Documents Unambiguously Establish That Rajan Is Personally Liable On The Notes.**

The plain language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." Cal. Civ. Code §§ 1625, 1638. *In re Gerwer*, 253 B.R. 66, 73 (9th Cir. B.A.P. 2000). When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible. *Id.*; Cal. Civ. Code § 1639. In determining intent, the terms of a contract are to be given their ordinary meaning. Cal. Civ. Code § 1640. Further, parol evidence is not admissible to vary, alter, or add to the terms of an integrated written contract, unless the language of the contract is reasonably susceptible to more than one meaning. *Pacific Gas & Elec. Co.*

5

**MEMORANDUM DECISION AND ORDER**

1  *v. G.W. Thomas Drayage & Rigging Co., Inc.*, 69 Cal. 2d 33, 37 (1968). As a result, if a contract's
2  terms are unambiguous, the court interprets the contract without consideration of extrinsic evidence.
3  *In re Crow Winthrop Operating Partnership*, 241 F.3d 1121, 1124 (9th Cir. 2001).

4  In making the determination whether parol evidence is admissible, courts may look to, without
5  admitting, evidence concerning the parties' intentions in order to determine whether an ambiguity exists,
6  i.e., whether the language of the contract is reasonably susceptible to the differing interpretations urged
7  by the parties. *Home & Land Publishing, Ltd. v. Apartmentnet Corporation*, 100 F. Supp. 2d 1248,
8  1253 (S.D. Cal. 2000). If it is, then the court may use extrinsic evidence to interpret the contract.

9  Here, Rajan argues, that the use of the term "full recourse," in both promissory notes creates an
10  ambiguity as to whether or not the notes were collectible against all of his assets. Therefore, in
11  interpreting the contract, Rajan submits that the court can and should consider parol evidence that Rajan
12  understood and intended the words "full recourse" to mean that Jasmine would only have recourse
13  against the full amount of the stock pledged as security for the notes. Rajan also points to the deposition
14  testimony of Ravi Dattatreya, Jasmine's former CEO, who stated that Jasmine had family-like corporate
15  culture and that he did not expect Jasmine to enforce the notes according to their terms. I disagree with
16  Rajan's argument.

17  The language of the promissory notes that Rajan signed is quite clear. In both promissory notes,
18  Rajan unconditionally promised to pay Jasmine the principal sum of the note plus interest. Additionally,
19  each note expressly provided that the full amount of the note would be "immediately due and payable"
20  upon the termination of Rajan's consulting relationship with Jasmine. The notes even advised Rajan
21  that if suit had to be commenced to collect the notes, that attorneys' fees would be added to the amount
22  due.

23  I am not persuaded that the use of the term "full recourse" somehow makes the language of the
24  contract less than clear. Under California law, I must give the term its ordinary meaning. Cal. Civ.
25  Code § 1640. As defined in Webster's New World Dictionary, Second College Edition, "recourse" is
26  "the right to demand payment from the maker or endorser of a commercial paper." The accompanying
27  adjective "full," given its ordinary or popular sense, establishes that the right to demand payment is
28  complete or unlimited. This ordinary meaning is plain and unambiguous and, as a result, I conclude that

6

**MEMORANDUM DECISION AND ORDER**

the term "full recourse" is not reasonably susceptible to more than one meaning. The parol evidence that Rajan offers, therefore, is not admissible to establish that the parties intended "full recourse" to mean "recourse limited to the stock" - an interpretation that would vary the plain language of the notes. Based on the admissible evidence before me, the notes clearly establish that Rajan agreed to repay the notes' principal in full, plus interest, and that Rajan's obligation to pay is unconditional.

**II.    There Is No Evidence Of A Mutual Mistake That Would Prevent Enforcement of the Notes According To Their Terms.**

Although it is not entirely clear from his submissions, Rajan appears to argue that even if the term "full recourse" is not ambiguous, it does not properly reflect the mutual intent of the parties at the time the notes were executed. He urges that parol evidence is admissible to determine whether a mutual mistake of fact occurred in committing the notes to writing.

Generally, a written contract is presumed to correctly reflect the parties' intentions. However, the presumption may be overcome if there is sufficient evidence that the written instrument does not conform to the true agreement of the parties. *Appalachian Insur. Co. V. McDonnell Douglas Corp.*, 214 Cal. App. 3d 1, 19 (1989). When, through mistake, a written contract does not express the real intention of the parties, the intention of the parties is to be given effect and the erroneous parts of the writing should be disregarded. Cal. Civ. Code § 1640; *Hess v. Ford Motor Company*, 27 Cal. 4th 516, 524 (2002). In determining whether a mutual mistake occurred, a court may consider extrinsic evidence. *Hess*, 27 Cal. 4th at 525. Nevertheless, the court has no power to make a new contract for the parties. If the written instrument accurately reflects the parties' agreement, albeit an agreement based on a mistaken assumption, the contract may not be reformed. *Appalachian Insur.*, 214 Cal. App. 3d at 20.

Here, Rajan asserts that the parties' true agreement was that Jasmine would only look to the stock for repayment of the notes. Again, he bases this argument on his personal understanding that the term "full recourse" meant recourse against the stock pledged as security for the notes. Additionally, he relies on Dattatreya's deposition testimony that Jasmine was a company with a caring attitude and a family feeling. Dattatreya analogized the notes to a loan that he might make to a son - one where the note might be legally binding but he would never enforce it. Dattatreya indicated that he may have told

7

**MEMORANDUM DECISION AND ORDER**

some employees, "Don't worry," in or around the time that they were signing the notes. Accepting these pieces of evidence as true, they do not raise a triable issue of fact as to whether Jasmine and Rajan acted under a mutual mistake of fact when Rajan executed the promissory notes.

Even taken in a light favorable to Rajan, the evidence fails to establish that Jasmine intended to enter into something less than full recourse notes. To the contrary, the plain language of the notes indicates that Jasmine intended the notes to be full recourse. Dattatreya's testimony does not suggest a different intent. He only testified that he personally believed the company would not press for payment of the notes, not that Jasmine ever intended to relinquish its *ability* to pursue payment from Rajan. Mere assertions by the payee of a note that he will not pursue payment do not affect the terms of the note itself. *Pierce v. Avakian*, 167 Cal. 330, 332 (1914). Significantly, Rajan offers no evidence that would explain why Jasmine had him execute two notes that were contrary to the limited recourse that Rajan claims was intended.

Further, Rajan's personal notion of what the term "full recourse" meant does nothing to establish that the contract does not conform to the parties' true agreement. He concedes that he entered into "full recourse" notes. His declaration only establishes that he misunderstood what that term meant. As noted above, the court has no power to make a new contract for the parties. Here, the notes accurately reflect the parties' agreement to enter into full recourse notes. The court may not ignore that agreement simply because the agreement is based upon Rajan's mistaken assumption about the meaning of "full recourse." *Appalachian Insur.*, 214 Cal. App. 3d at 20.

Rajan's reliance on *Hess v. Ford Motor Company*, 27 Cal. 4th 516 (2002) does not require a different conclusion. In *Hess*, an injured automobile passenger reached a settlement with the driver and the driver's insurer. Hess signed a release that released the driver, his insurer, and "all other persons, firms, corporations, associations or partnerships." In a later lawsuit against the car manufacturer, the manufacturer relied on the release to avoid liability. In deciding that the release should be reformed, the court noted that every party to the release specifically testified that they did not intend for the settlement agreement to release the car manufacturer. As a result, the court was able to conclude that the written release did not properly reflect the parties' intent. Here, by contrast, there is no evidence suggesting that Jasmine did not intend to enter into notes that were full recourse. As a result, there is

8

**MEMORANDUM DECISION AND ORDER**

no triable issue as to whether mutual mistake precludes enforcement of the promissory notes according to their terms.

**III.     Parol Evidence Is Inadmissible To Show That Jasmine Falsely Induced Rajan To Exercise His Stock Options Early.**

Rajan's opposition papers also seem to suggest that Rajan was falsely induced to enter into Early Exercise Agreements regarding both the June and October stock options. He points to a June 2000 cover memorandum accompanying the package of documents relating to the grant and early exercise of his June stock option that generally listed and described the various documents in the package. With respect to a number of the listed documents, including the June Early Exercise Agreement, the memorandum stated, "[t]his must be signed by you and your spouse, if any." Absent this direction, Rajan asserts that he would not have entered into the Early Exercise Agreements and, in turn, would not have executed the promissory notes.

Although fraudulently inducing another to execute a contract may render a contract unenforceable, when the alleged misrepresentation goes squarely against the terms of the writing, evidence of it cannot be received or counted upon to support a finding of fraud. *Bank of America National Trust and Savings Association v. Lamb Finance Co., Inc.*, 179 Cal. App. 2d 498, 503 (1960). In the case at bar, the written contractual documents are clear that early exercise of the stock options was not mandatory. Both the June and October Notices of Stock Option Grant specifically advised Rajan that each option "*may* be exercised prior to becoming vested." Additionally, the June and October Stock Option Agreements both provided that if Rajan *chose* to exercise the option as to unvested shares, then Rajan would have to execute the "Early Exercise Notice and Restricted Stock Purchase Agreement. Finally, the two Early Exercise Agreements, themselves, plainly provided that Rajan "*elects* to exercise [the] option to purchase Common Stock" and that he "has *elected* to purchase . . . Shares that have not yet vested under the Vesting Schedule" (emphasis added). It is also significant that the contractual documents notified Rajan of certain tax benefits that would result from early exercise of the options. Therefore, Rajan's claim that he had no reason to exercise his options early is also contrary to the written terms of this transaction. In the face of these plain contractual provisions, Rajan's parol

9

evidence of false inducement is directly at odds with the written contract and is not admissible. *Id.* As a result, there is no competent evidence that Rajan was falsely induced to enter into the Early Exercise Agreements or the promissory notes.

**IV.     The Defense Of Laches Is Unavailable In This Action At Law.**

Laches can be asserted only in a suit in equity. Witkin, SUMMARY OF CALIFORNIA LAW, 10th ed., *Equity*, vol. 13, § 17 (2005); *In re D&L Nicolaysen*, 228 B.R. 252, 259-60 (E.D. Cal. 1998);. Although a bankruptcy court is a *court* of equity, the breach of contract claim in this adversary proceeding is an action at law.  Laches, as a purely equitable doctrine, cannot be invoked as a defense to an adversary proceeding where the action is primarily a legal action and seeks monetary damages rather than equitable remedies. *Nicolaysen*, 228 B.R. at 259-60; *In re Louis Rosenberg Auto Parts, Inc.*, 209 B.R. 668, 672 (W.D. Pa. 1997).

*Beaty v. Selinger*, 306 F.3d 914 (9th Cir. 2002), cited by Rajan, does not hold differently. In *Beaty*, the ninth circuit considered whether laches was a defense to a non-dischargeability action filed under § 523 of the Bankruptcy Code. A non-dischargeability action under the Code is not a legal action for money damages like the one alleged in this adversary proceeding. Because laches is not available as a defense to the Committee's complaint, it cannot serve as a basis for denying the Committee's motion for summary judgment.

**V.     Rajan Has Raised A Material Question Of Fact As To Whether He Is Entitled To A Setoff Against The Amounts Due On The Notes.**

As a final defense to the Committee's action on the notes, Rajan asserts that Jasmine has never paid him for the consulting services that he rendered to the company. He urges that he is entitled to a set off against any liability on the notes equivalent to the amount that Jasmine owes to him. The Committee does not contest Rajan's right to set off sums that are due to him. Rather, the Committee simply urges that there is a total failure of proof that Jasmine owes anything to Rajan or, if it does, that there is inadequate proof of the amount of the set off.

10

Rajan has not filed a cross motion for summary judgment on its set off defense. As a result, he was not required to provide proof sufficient to establish his claim. Rather, it is enough if he has provided evidence, which if believed, creates a triable question of fact as to whether he is entitled to some amount of set off against the amount due under the promissory notes. In support of his set off claim, Rajan offers the letter agreement establishing the terms of his former consulting relationship with Jasmine, including the amount due for each engineer hired with Rajan's help. Rajan's declaration further states that he placed many candidates pursuant to the letter agreement. Rajan also offers the declaration of a former Engineering Manager at Jasmine who states that he was recruited through Rajan's efforts. Finally, Rajan submitted copies of a number of emails from the year 2000, which according to Rajan, reflect some but not all of his recruiting efforts. As the party opposing summary judgment, Rajan's evidence must be accepted as credible and be construed in Rajan's favor. While this evidence may not be sufficient to prove conclusively that Rajan is entitled to a set off or the amount of any set off, it does, at a minimum, create a triable issue of fact in that regard.

## CONCLUSION

Based on the admissible evidence before me, there is no genuine issue of material fact with respect to the validity of the promissory notes, Rajan's liability on the promissory notes and the amounts due thereunder. However, Rajan has raised a genuine issue of material fact regarding his defense that he is entitled to a set off against the amount due on the notes related to unpaid services that he allegedly rendered to Jasmine. For the reasons explained, partial summary judgment is granted in favor of the Committee and against Rajan determining that the two promissory notes are valid and enforceable according to their terms, that Rajan is personally liable for the amounts due under both notes and the amount due and payable prior to any set off. The Committee's motion is denied with respect to Rajan's claim of set off.

Good cause appearing, IT IS SO ORDERED.

\*\*\*\* END OF ORDER \*\*\*\*

11

**MEMORANDUM DECISION AND ORDER**

Adv. P. 04-5285

# UNITED STATES BANKRUPTCY COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SERVICE LIST

William McGrane
Maureen Harrington
MCGRANE GREENFIELD LLP
One Ferry Building, Suite 220
San Francisco, CA 94111

Bernard S. Greenfield
MCGRANE GREENFIELD LLP
40 South Market Street, 7th Floor
San Jose, CA 95113

James Cai
Judith Pearce
FORTUNE LAW GROUP LLP
100 Century Center Court, Suite 315
San Jose, CA 95112